RANKIN v. TYGARD et al.

(Circuit Court of Appeals, Eighth Circuit. August 19, 1912.)

Nos. 3,607, 3,608.

*(Syllabus by the Court.)*

1. BANKS AND BANKING (§ 251*)—NATIONAL BANKS—OFFICERS—TERM.

Subject to the free exercise by its board of directors of its power to remove him at its pleasure at any time, a national bank may, by its articles of incorporation and by-laws, fix the term of office of its president, or of any other ministerial officer, and the term so fixed becomes his legal term of office, although during that term he is subject to recall by the board under section 5136, U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3455).

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 940-943; Dec. Dig. § 251.*]

2. PRINCIPAL AND SURETY (§ 71*)—NATIONAL BANKS—OFFICERS—TERM—LIABILITIES ON BONDS.

When a term has been so fixed, sureties on the bond to answer for the breaches of duty of a president during his legal term are not liable

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for his breaches under a subsequent appointment after the expiration of his term current when their bond was given.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 117–119; Dec. Dig. § 71.*]

**3.** BANKS AND BANKING (§ 251*)—NATIONAL BANKS—OFFICERS—RESTRICTING CHOICE TO MEMBERS OF BOARD.

The board of directors of a national bank may by a by-law restrict their choice of a president to its own members, even if others are eligible under the national banking law.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 940–943; Dec. Dig. § 251.*]

**4.** BANKS AND BANKING (§ 251*)—NATIONAL BANKS—OFFICERS—REMOVAL.

A national bank provided by its articles of association and by-laws that its board of directors should elect one of its members president of the association who should hold his office, unless sooner removed by a two-thirds vote of all the members of the board, for the term for which he was elected a director.

*Held,* if the restriction of the power of removal to a two-thirds vote was ultra vires and void under section 5136, United States Revised Statutes (U. S. Comp. St. 1901, p. 3455), the other terms of the provision were valid.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 940–943; Dec. Dig. .§ 251.*]

**5.** STATUTES (§ 64*)—EFFECT OF PARTIAL INVALIDITY.

Where a part of a law is void and a part is valid and the void part is readily separable from the valid part, the latter may be sustained and the former disregarded, unless the void part is so connected with the general scope of the law as to make it impossible, if it is stricken out, to give effect to the apparent intention of the legislative body that enacted it.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–60, 195; Dec. Dig. § 64.*]

**6.** BANKS AND BANKING (§ 262*)—NATIONAL BANKS—PRESIDENT—BREACH OF DUTY.

Where a president of a national bank in actual management of its daily business made a note for $3,000, without authority, in the name of the H. Company by himself, its treasurer, placed it among the bills receivable of the bank, credited the H. Company with $3,000, and paid $2,000 of it to the H. Company and $250 to another party, the proximate cause of the conversion of the funds of the bank was his act as its president, and not his individual act, or his act as treasurer of the H. Company, and that act was a breach of his duty lawfully to administer the office of president and faithfully to account for the moneys and funds of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. § 262.*]

**7.** BANKS AND BANKING (§ 262*)—NATIONAL BANKS—PRESIDENT — AUTHORITY.

Where the board of directors of a national bank has by resolution expressly authorized, or for a reasonable length of time permitted the president of the bank to participate in the actual management of its daily business affairs, his authority to discount commercial paper and to do other acts within the scope of the authority of its other ministerial officers is ample.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. § 262.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**8.** PRINCIPAL AND SURETY (§ 101*)—BANKS AND BANKING—NATIONAL BANKS —OFFICERS—RELEASE OF SURETIES.

An immaterial alteration of the contract of sureties without their knowledge after they have signed, an alteration which neither changes the legal identity of the contract nor the liabilities of the parties to it, does not release the sureties.

After a bond to indemnify a national bank against the delinquencies of its president, which recited in its first line that he was the principal, had been signed by the president over the word "principal" and by the first surety below that word, and over the word "securities," the principal inserted the name of the surety before the word "principal" in the first line of the bond. While it was in that condition, two other sureties signed below the signature of the first surety and above the word "securities," and thereafter the name of the first surety was erased where it had been inserted in the first line of the bond before the word "principal."

*Held*, these alterations were immaterial, and did not release the sureties.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 169–180; Dec. Dig. § 101.*]

**9.** ALTERATION OF INSTRUMENTS (§ 27*) — MATERIALITY — PRESUMPTION AND BURDEN OF PROOF.

The legal presumption is that an alteration apparent on the face of a written instrument was made before its execution, and is therefore immaterial, and the burden is not on the party who offers the instrument in evidence to explain the alteration, but it is on him who assails the instrument to prove that the alteration was made after its execution, and that it is material.

[Ed. Note.—For other cases, see Alteration of Instruments, Cent. Dig. §§ 230–247; Dec. Dig. § 27.*]

**10.** BANKS AND BANKING (§ 262*)—NATIONAL BANKS—LIABILITIES ON BONDS.

A bond to a bank was conditioned to take effect commencing on the date of its approval by proper authority.

*Held*, its approval by all the directors of the bank, though not by a majority thereof at a meeting of the board, its receipt, and preservation by an officer of the bank was sufficient to put it in operation.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. § 262.*]

**11.** ELECTION OF REMEDIES (§§ 5, 11*)—FINALITY OF ELECTION—MISTAKE AS TO REMEDIES.

Where a wrong has been inflicted, and the victim is doubtful which of two inconsistent remedies is the right one, he may pursue both until he recovers through one.

His prosecution of the wrong remedy to a judgment of defeat will not, in the absence of facts creating an equitable estoppel, bar him from subsequently pursuing the right remedy to victory.

It was no defense to the action on the bond on the theory that the principal had made a note of $3,000, without authority from the H. Company that the receiver sued the H. Company on the note on the theory that the principal had authority to make it. He could lawfully pursue each remedy until the loss of the bank was restored.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. §§ 6, 14; Dec. Dig. §§ 5, 11.*]

In Error to the Circuit Court of the United States for the Western District of Missouri.

Action by George C. Rankin, receiver of the Bates National Bank of Butler, Mo., against F. J. Tygard and others. From the judgment, both parties bring error. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

Edmund H. McVey, of Kansas City (John A. Eaton, of Kansas City, on the briefs), for receiver.

Frank Hagerman, of Kansas City (Thomas J. Smith, of Butler, and T. B. Wallace, of Kansas City, on the briefs), for Tygard and others.

Before SANBORN and HOOK, Circuit Judges, and WILLARD, District Judge.

SANBORN, Circuit Judge. On July 22, 1905, F. J. Tygard, as principal, and John C. Hayes, J. M. Catterlin, and Thomas J. Smith, as sureties, gave to the Bates National Bank of Butler, Mo., a bond in the sum of $10,000 conditioned that Tygard, who was the president of that bank, should faithfully discharge the duties of his office "during the legal term of said office," and that he should account for all funds which should come to his hands as such president. Tygard was elected president on January 10, 1905, and again on January 15, 1906, in accordance with the provisions of the articles of association and by-laws of the bank to the effect that the members of the board of directors should be elected annually on the second Tuesday in January in each year, that this board should elect one of its members president of the bank, who should hold his office, unless he should be disqualified or sooner removed by a two-thirds vote of the members of the board, for the term for which he was elected a director. The by-laws provided that the directors should, as soon as qualified, select from their number a president who should hold his office for one year and until his successor was elected and qualified, provided that the board, for good cause, might remove him by a two-thirds vote of all the directors. The receiver of the bank, which had become insolvent, sued Tygard and the sureties on his bond for a breach thereof which occurred in December, 1905, and for numerous breaches which occurred subsequent to January 16, 1906, and recovered upon the former, but failed to recover upon the latter causes of action because the court held that they did not occur during the term of Tygard's office which was current when the bond was given. The receiver specified this ruling as error, and sued out his writ to correct it. The sureties insisted that they were not liable on the bond for any amount whatever, assigned many errors in the trial, and brought their writ for a reversal of the judgment against them.

[1, 2] The contention of the receiver is that there can be no legal term of office of the president of a national bank because he is subject to removal at any time at the pleasure of the board of directors. They base this position upon the provisions of section 5136, U. S. Revised Statutes (U. S. Comp. Stat. 1901, p. 3455), to the effect that a national banking association has the power: "Fifth. To elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties, require bonds of them and fix the penalty thereof, dismiss such officers or any of them at pleasure, and appoint others

to fill their places. Sixth. To prescribe, by its board of directors, by-laws not inconsistent with law, regulating the manner in which its stock shall be transferred, its directors elected or appointed, its officers appointed, its property transferred, its general business conducted, and the privileges granted to it by law exercised and enjoyed." Act June 3, 1864, 13 Stat. c. 106, p. 101, § 8; Revised St. U. S. § 5136, p. 993 (U. S. Comp. Stat. 1901, pp. 3455, 3456). The argument of counsel for the receiver is: The board of directors of a national bank has the inalienable power to remove the president of the bank without cause at any time. It cannot contract to keep him in office for any time certain. It cannot renounce or agree not to exercise its power of removal at pleasure. Therefore it cannot contract that, subject to the free exercise of this power of removal at will, it will not continue him in office beyond a specified time without another appointment, nor that subject to the right to exercise its power of removal at pleasure it will continue him until that time. The premises of this argument, however, do not compel its conclusion. An election or appointment to an official position for a fixed term is, it is true, inconsistent with a removal during the term without cause in the absence of a precedent reservation of the right to make such a removal during the term. But an election or appointment to the office for a specified term subject to the precedent expressed condition that the elective or appointive power may remove at will at any time during the term is consistent with such a removal without cause and it is as much an election or appointment for a legal term as an election or appointment without such a reservation. It is an election or appointment for a fixed term subject to recall and the legal term is the time the person elected or appointed will hold his office if the power to recall is not exercised. Fresno Enterprise Co. v. Allen, 67 Cal. 505, 509, 8 Pac. 59.

[3] It is said that the articles of association and the by-laws of this bank are ineffectual in this regard because they provide that the president shall be a member of the board and shall hold his office for a year unless sooner removed by a two-thirds vote of the members of the board. Conceding, but not admitting, that the act of Congress does not require, it certainly does not prohibit, the board from choosing one of its members president of the association, nor from adopting articles and by-laws to that effect.

[4] Hence the only provision of these articles or by-laws that can be in any way inconsistent with any of the terms of the national banking law is the implied restriction of the power of the board to remove the officer at pleasure, which requires a two-thirds instead of a majority vote of its members to accomplish that end. But, if this restriction is not valid, it is simply ultra vires, and hence void. It is easily separable from the other provisions of the articles and by-laws.

[5] They are, so far as they are not inconsistent with the acts of Congress, the law of the bank and under the familiar rule that, where a part of a law is void and a part valid and the void part

is readily separable from the valid part, the latter may be sustained and the former disregarded, unless the void part is so connected with the general scope of the law as to make it impossible, if it is stricken out, to give effect to the apparent intention of the legislative body which enacted it, the restriction of the power of removal to a two-thirds vote of the members, if void, does not destroy or weaken the effect of the remaining provisions of the article and by-laws and they must stand. The contention of counsel for the receiver therefore cannot prevail, and under the act of Congress and the articles of association and by-laws of the bank the legal term of its president current on July 22, 1905, when the bond was given, was from January 10, 1905, when he was elected, until January 15, 1906, when he was again elected, and the sureties upon the bond were not liable for his breaches subsequent to that date.

The decision and opinion of this court in Westervelt v. Mohrenstecher, 76 Fed. 118, 121, 22 C. C. A. 93, 96, 34 L. R. A. 477, cited in opposition to this view, has been carefully considered, but they are not in conflict with it. The sureties upon the bond of a cashier of a national bank, who had bound themselves to answer for his breaches of duty "for and during all the time he shall hold the office of cashier of the said bank," were held liable for his defaults in that case as long as he remained cashier, although he was reelected thrice during that time. But the sureties in this case did not agree to answer for the defaults of Tygard as long as he should hold the office of president. They expressly restricted their liability to his breaches of duty as president during the "legal term of said office." Their bond was a simple contract between them and the bank, and the question here is, What was the sense and meaning of the words "the legal term of said office" upon which the minds of these parties met when they made this agreement? And when the facts are considered that the bank had the power to prescribe the time during which Tygard should hold his office under its appointment, subject to its right to recall him at its pleasure, that it had by its articles and by-laws fixed this time at one year from January, 1905, and until his successor was elected and qualified, and that the sureties offered and the bank accepted their bond under these provisions, there is no less doubt that the minds of both parties to this bond, when they made it, met upon the intention that the liability of the sureties thereon should be limited to a time antecedent to Tygard's subsequent appointment in January, 1906, than there was in Westervelt's case that the sureties on Mohrenstecher's bond intended to agree to answer for his defaults as long as he should continue to be the cashier of the bank.

The court also held in Westervelt's Case that the board of directors of a national bank could not, by declaring the term of office of an officer of that bank to be annual and by electing such an officer for an annual term, divest itself of its power to remove him from his office at pleasure. But that decision is not inconsistent with the conclusion in this case that such a board of directors may,

fix the term of an officer of its bank subject to its unrestricted power to remove him at pleasure during that term, and that the term so fixed becomes the legal term of his office notwithstanding his liability to recall before its expiration. In the former case, it is held that the board may not deprive itself of its power to remove at any time. In the latter case it is held that it may fix a limit of the time within which the officer may hold his office subject to removal at pleasure without another election.

Counsel have indulged in an exhaustive review of the course of legislation with reference to the appointment of the president and other ministerial officers of a national bank and in an interesting debate of the questions whether or not he must be one of the members of the board of directors and whether the office of president of the bank under section 5136, U. S. Revised Statutes, is the same as that of president of the board under section 5150, or is another office. But the fact is that, if the president of the board may be other than a member of the board under the national banking law, there is no prohibition in that law of a limitation of its choice by the board itself to its own members, and the fact that in this case the board so limited itself by its by-laws has rendered the discussion and decisions of these questions immaterial in this case, and they are here dismissed. There was no error in the ruling of the court below that the current term of office of Tygard, the president of the bank, on July 22, 1905, when the bond was given, expired on January 15, 1906, when he was again elected president pursuant to the law, the articles of association, and the by-laws, and that the sureties were not liable for his subsequent breaches of duty.

[6] The condition of the bond in suit is that:

"If the said F. J. Tygard shall in all things faithfully perform the duties of his said office * * * and shall well and truly administer the said office of president of the Bates National Bank according to law, and well and faithfully account for all moneys and funds which shall come to his hands as such president according to law, then this obligation to be void and of no effect, otherwise to remain in full force and effect."

On December 22, 1905, Tygard was the treasurer of the Masonic Home, a charitable organization, in the state of Missouri. He made a promissory note for $3,000, whereby the Masonic Home purported to promise to pay that amount to the bank, signed the note with the name of the Home by F. J. Tygard, treasurer, placed it among the bills receivable of the bank, and placed to the credit of the Home on the books of the bank $3,000, $2,000 of which he subsequently paid over to the Home and $250 to some other party. He had no authority to make this note on behalf of the Home, and an action by the receiver to recover of the Home failed. No part of this $3,000 has been paid back to the bank or to the receiver. It is upon this cause of action that the judgment against the sureties is founded. They insist that they are not liable for Tygard's wrongful act here because the taking of this money from the bank and its diversion to third parties in return for the unauthorized note of the Home was not a breach

of any of his duties as president and because it was his individual act, or his act as treasurer of the Home, and not his act as president of the bank, which was the proximate cause of the loss of this money by the bank. But two of the duties of a president are well and truly to administer the office of president of the bank according to law, and well and faithfully to account for the moneys and funds which come into his hands as president. His diversion of these funds of the bank to third parties was a breach of each of these duties. It was a failure to administer his office according to law for he could not lawfully, by substituting, or discounting, or pretending to discount, a note which he knew to be unauthorized for the funds of the bank, convert those funds to the use of third parties or of himself, and his failure to repay the amount he thus converted was a failure to account for funds of the bank which came to and were diverted by his hands. Nor was it his individual act, or his act as treasurer of the Home, which withdrew these funds from the bank. He had neither power nor opportunity individually or as treasurer of the Home to exchange the funds of the bank for this note. But, as president of the bank, he had access to and control of its moneys and the power to dispose of them. It was by the use of this opportunity and this authority that he withdrew these moneys from the bank, and his wrongful act and breach of duty as the president of the bank were the proximate and efficient cause of its loss of these funds.

Much is said in the brief of the failure of the receiver to allege in his petition what the duties of the president were which he failed to discharge. But the receiver clearly set forth in his petition the conversion of this fund by the president of the bank by the use of this unauthorized note which he made in the name of the home. He averred that that act was a breach of the duty of Tygard as president of the bank and of the obligations of this bond. The law so clearly declares the duty of the president of a bank to abstain from a conversion of its funds to his own use, or to the use of others, and to account for those moneys which come to his hands, that an application of the maxim that every one is presumed to know the law is peculiarly just and appropriate here. It was unnecessary to plead the law, and the petition was sufficient. It is argued that the president had no authority to discount commercial paper, and therefore his act here was not an act as president of the bank. If the concession were made that he had no such authority, it would not detract from the force of the argument made or the conclusion already reached, that his conversion of the funds of the bank by the use of the worthless note and his failure to account for them was his act as such president.

[7] But the facts found by the court below, "that said Tygard, by virtue of his office, by virtue of the action of the board of directors of the Bates National Bank and by virtue of a long course of dealing of said Tygard, recognized and acquiesced in on the part of the board of directors of said bank, was authorized and permitted as its president to take a daily and constant part in the management and transaction of the affairs of said bank by virtue of the fact that he was its chief officer," leave no doubt of his authority to discount commercial

paper for the bank and to do any other lawful act within the power of any of its ministerial officers. The board of directors of a national bank has the power under section 5136, U. S. Revised Statutes, to authorize the president of the bank to discount commercial paper and to do any other act within the power of the cashier or of any other officer of the bank. and where it has by resolution expressly authorized, or by acquiescence for a reasonable length of time permitted, him to participate in the actual management of its daily business affairs, his authority to discount commercial paper and to do other acts in its behalf within the scope of the authority of its ministerial officers is established. United States National Bank v. First National Bank, 79 Fed. 296, 299, 24 C. C. A. 597: Hanover Nat. Bank v. First Nat. Bank, 109 Fed. 421, 424, 48 C. C. A. 482; Auten v. United States Nat. Bank, 174 U. S. 125, 148, 19 Sup. Ct. 628, 43 L. Ed. 920.

[8] The court below found that the bond in suit was signed about July 22, 1905, that:

"At the time it was signed by Jno. C. Hayes, the first surety signing the same, his name did not appear on the first line of said bond immediately after the name of F. J. Tygard and immediately preceding the words 'as principal,' that immediately after said Hayes signed said bond that name was written there by Tygard, and so remained unerased until the sureties Catterlin and Smith had signed the same. Said name of Jno. C. Hayes so written on the first line of the bond was thereafter erased at a time not shown by the facts in this case."

It is assigned as error that these facts disclose such an alteration of the bond after the sureties signed it as released them from all obligation thereunder. Numerous authorities may be found, and some have been cited, to the effect that any alteration without the knowledge of the obligors of a bond, or other contract, after it is signed, whether material or immaterial, releases them. But the reason of the matter and the great weight of authority sustain the established modern rule that a material alteration releases, but an immaterial alteration, one which neither changes the legal identity of the contract nor the liabilities of the obligors, is not effective, and does not release them. Mersman v. Werges, 112 U. S. 139, 142, 5 Sup. Ct. 65, 28 L. Ed. 641; First National Bank v. Weidenbeck, 97 Fed. 896, 898, 38 C. C. A. 131. 133; Rudesill v. Jefferson County Court, 85 Ill. 446, 448, 449; Shuck v. State, 136 Ind. 63, 35 N. E. 993, 995; Herrick v. Baldwin, 17 Minn. 209, 212 (Gil. 183), 10 Am. Rep. 161; Arnold v. Jones, 2 R. I. 345. 352; Crawford v. Dexter, 5 Sawy. 201, 6 Fed. Cas. No. 3,368, pp. 775, 776; 2 Cyc. p. 217. The first part of the bond read in this way: "We the undersigned, F. J. Tygard, Jno. C. Hayes as principal, and Jno. C. Hayes, J. M. Catterlin and Thos. J. Smith, as securities, acknowledge ourselves to be indebted," etc., in the sum of $10,-000. The bond then declares that its condition is such that:

"Whereas, the said F. J. Tygard, principal, has been duly elected to the office of president of said Bates National Bank. * * * Now, therefore, if the said F. J. Tygard shall in all things faithfully perform the duties of his said office" etc. the bond "shall be void, otherwise in force." And the

bond closes thus: "In testimony whereof, we have hereunto set our respective hands this 22nd day of July, 1905.

"F. J. Tygard, Principal.
"John C. Hayes,
"J. M. Catterlin,
"Thomas J. Smith, Securities."

When Hayes signed the bond, Tygard's name was evidently written into the first line of the bond as principal, and he had signed at the end of the bond above the word "principal." Hayes signed below that word and over the word "securities" as one of the latter. The subsequent insertion of his name in the first line of the bond before the word "principal," its erasure, and insertion in the next line as one of the securities could not have affected his liability. He became a surety when he signed, and he remained a surety to the end. When Catterlin and Smith signed, Hayes' name had been inserted and remained before the word "principal" in the first line of the bond, but that insertion did not make him a principal and the body of the bond, which clearly showed that Tygard, and Tygard alone, was the party against whose defaults they were agreeing to indemnify the bank and the only principal, and the location of the signature of Hayes after the word "principal" render it impossible that they could have been misled or deceived into the belief that he had signed, or was bound as a principal. They could not have failed to know that he was a surety and not a principal, and the subsequent erasure of his name as the latter in no way changed the liabilities which they or he assumed when they respectively signed the bond. The alterations neither changed the legal identity of the contract, nor affected the liability of the parties to it, and the sureties were not released thereby.

[9] Complaint is made that the court received the bond in evidence when offered by the receiver before any explanation of the alteration, which appeared on its face, had been made. But the only alteration apparent on its face was the erasure of the name Jno. C. Hayes where it had been inserted, before the word "principal"; and, while there is a conflict of authority on this question (Smith v. United States, 2 Wall. 219, 233, 17 L. Ed. 788), the weight of reason and of authority is that the legal presumption is that an alteration apparent on the face of an instrument in writing was made before its execution, and is therefore immaterial, and the burden is not on the party who offers the instrument in evidence to explain the alteration, but it is on him who assails the instrument to prove that the alteration was made after its execution and that it is material (Little v. Herndon, 10 Wall. 26, 31, 19 L. Ed. 878; Hanrick v. Patrick, 119 U. S. 156, 172, 7 Sup. Ct. 147, 30 L. Ed. 396; 2 Cyc. p. 240; Burnett v. McCluey, 78 Mo. 676).

[10] The condition of the bond was that Tygard should faithfully discharge the duties of his office during the legal term of said office "commencing on the date of the approval of this bond by the proper authority." The bill of exceptions declares that the receiver introduced evidence tending to show:

"That said bond was signed, executed, and delivered for safe keeping under the order of the board of directors of said bank to John B. Newberry, the vice president of said bank and a director thereof, about the time of the date

of said bond, and that said Newberry had deposited the same in a private safety box of the Bates National Bank, where the same remained until an inventory was taken of the assets of the bank at the time the same was turned over to the receiver."

The court below found that the bond was approved by the directors of the bank prior to the 22d day of December, 1905, but that the evidence was not clear whether the approval was made at the regular board meeting or at a called meeting of the board at which a quorum was present, or whether it was done informally, when two or more of them on different times met, and it refused to declare the law to be that, if the bond was never approved by a majority of the board of directors at a meeting, then the plaintiff could not recover. This ruling is specified as error, and counsel insist that the bond never became effective because it was never approved by the proper authority. That neither a minority nor a majority of a board of directors can, without a regular or called meeting of the board, adopt resolutions or perform acts on behalf of the board that will bind the directors not present or assenting, or the corporation, may be conceded. But acts of the board not evidenced by any record may be presumed from a subsequent course of action or acquiescence, which presupposes them, and the acceptance and approval of the bond of an officer by the board of directors of a bank may be presumed and found from proof of its receipt and preservation by the officers of the bank during the service of the officer, although there is no record of any such acceptance or approval in the minutes of the board. United States Bank v. Dandridge, 12 Wheat. 64, 73, 6 L. Ed. 552; Pryse v. Farmers' Bank (Ky.) 33 S. W. 532, 533; Fiala v. Ainsworth, 63 Neb. 1, 6, 88 N. W. 135, 93 Am. St. Rep. 420; Dedham Bank v. Chickering, 3 Pick. (Mass.) 335. In the case last cited the charter of the bank required the cashier to give bond with two sureties, to the satisfaction of the board of directors, for the faithful discharge of his duties. The board by a recorded vote approved two persons as sureties upon a bond to be subsequently executed. The court held that the finding in the possession of the president of a bond signed by these sureties executed subsequent to this vote of the board was sufficient evidence that the bond was satisfactory to the board of directors, although there was no other evidence that the board by resolution or vote declared it to be so. In the case at bar a jury was waived, and the court found that this bond was approved by the directors prior to December 22, 1905. This finding is conclusive upon this court (Dooley v. Pease, 180 U. S. 126, 21 Sup. Ct. 329, 45 L. Ed. 457), and every reasonable intendment may be indulged to support it. The finding is that it was approved, not by a majority of the directors, but by the directors, and it is a reasonable interpretation of this finding that it means that the bond was approved by all the directors. Such a bond when presented to the officers of a bank is an offer to that corporation by the obligors to indemnify it against the defaults of the principal. This bond was by its terms to take effect on its approval by proper au-

thority. Its receipt and safe-keeping by the officers of the bank was persuasive evidence of the acceptance by the bank of the offer which the bond tendered and hence of its approval, and we are unwilling to hold that its approval by all the directors, though not made by a majority of the board of directors at a meeting thereof, was not an approval by proper authority.

[11] It is specified as error that the court refused to hold that the receiver was barred from maintaining this action on the bond because he had brought an action against the Masonic Home on the note for $3,000 made by Tygard in its name, and for money had and received by the Home, and because it had good causes of action against the Home therefor. But there was no error in this ruling, although the action on the note, which necessarily asserted the authority of Tygard to make it, was inconsistent with the theory of the action on the bond, which is that he had no such authority. Where a wrong has been perpetrated and the victim is doubtful which of two inconsistent remedies is the right one, he may pursue both until he recovers through one, and, in the absence of facts creating an equitable estoppel, his prosecution of the wrong remedy to a judgment of defeat will not estop him from subsequently pursuing the right one to victory. Bierce v. Hutchins, 205 U. S. 340, 347, 27 Sup. Ct. 524, 51 L. Ed. 828; Thomas v. Sugarman, 218 U. S. 129, 133, 30 Sup. Ct. 650, 54 L. Ed. 967, 29 L. R. A. (N. S.) 250; Standard Oil Co. v. Hawkins, 74 Fed. 395, 398, 399, 20 C. C. A. 468, 472, 473, 33 L. R. A. 739; Barnsdall v. Waltemeyer, 142 Fed. 415, 420, 73 C. C. A. 515, 520; Harrill v. Davis, 168 Fed. 187, 195, 94 C. C. A. 47, 55, 22 L. R. A. (N. S.) 1153; In re Stewart (D. C.) 178 Fed. 463, 468; Nauman Co. v. Bradshaw, 193 Fed. 350, 354, 113 C. C. A. 274. The contract of the defendants was to indemnify the bank against any loss it might sustain from the failure of their principal to discharge faithfully the duties of his office and until those losses are repaid it is no defense for them that the bank, or its receiver, has or pursues other remedies to relieve from them. Westervelt v. Mohrenstecher, 76 Fed. 118, 120, 124, 22 C. C. A. 93, 95, 99, 34 L. R. A. 477; Vulcanite Co. v. Caduc, 144 Mass. 85, 10 N. E. 483; Bank v. Birch, 130 N. Y. 221, 29 N. E. 127, 14 L. R. A. 211; Emery v. Baltz, 94 N. Y. 408; White v. Smith, 33 Pa. 186, 75 Am. Dec. 589.

It is assigned as error that the court below received in evidence the books of account of the Masonic Home. Conceding, without stopping to discuss the proposition, that this was an erroneous ruling, it did not prejudice, and could not have prejudiced, the sureties in this action. The only effect of the account books was to show Tygard's indebtedness to the Home, and that was immaterial because his lack of authority to make the note and his conversion of the money obtained upon it charged him and the sureties with liability on the bond whether he was indebted to the Home or not. Error without prejudice is no ground for reversal.

The judgment below must be affirmed, and it is so ordered.